J-S55045-19

NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37

| IN RE: S.W., A MINOR | : | IN THE SUPERIOR COURT OF |
|---|---|---|
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: J.W., NATURAL FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1043 WDA 2019 |

Appeal from the Order Entered July 3, 2019
In the Court of Common Pleas of Bedford County Orphans' Court at
No(s):  No. 9 AD 2017

| IN RE: J.W., A MINOR | : | IN THE SUPERIOR COURT OF |
|---|---|---|
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: J.W., NATURAL FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1044 WDA 2019 |

Appeal from the Order Entered July 3, 2019
In the Court of Common Pleas of Bedford County Orphans' Court at
No(s):  No. 10 AD 2017

BEFORE:   MURRAY, J., McLAUGHLIN, J., and COLINS, J.[*]

MEMORANDUM BY COLINS, J.:                          FILED NOVEMBER 22, 2019

Appellant, J.W. (Father), appeals from the orders entered July 3, 2019,

in the Court of Common Pleas of Bedford County, that granted the petitions

of Bedford County Children and Youth Services (BCCYS), and involuntarily

terminated his parental rights to his sons, J.W., Jr., (born October 2013) and

_____

[*] Retired Senior Judge assigned to the Superior Court.

S.W. (born August 2012) (collectively, Children), pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (5), (8), and (b) of the Adoption Act.[1]  After careful review, we affirm.

This Court previously summarized the procedural and factual history of this matter as follows:

> The family became known to BCCYS in March 2015 due to issues of substance abuse, and remained active with BCCYS throughout 2015 and into 2016 due to continued issues of substance abuse, unstable housing, domestic violence, and parenting skills.  Order of Adjudication and Disposition – Child Dependent, 3/24/16, Findings of Fact.  The [c]hildren[2] were removed from parental care by emergency order dated and entered March 17, 2016. Order for Emergency Protective Custody, 3/17/16.  Subsequent to shelter care orders dated March 18, 2016, and filed March 22, 2016, maintaining their commitment, the [c]hildren were adjudicated dependent by order dated March 24, 2016, and filed March 29, 2016.  Shelter Care Order, 3/22/16; Order of Adjudication and Disposition – Child Dependent, 3/24/16. Specifically, in adjudicating the [c]hildren dependent, the court noted as follows in its Findings of Fact:
>
> > On March 17, 2015, BCCYS received a report regarding drug use/abuse by the [children's] parents [] and other household members [].
> >
> > [BCCYS] began an intake assessment of the family and since March, 2015, the children moved from place

_____

[1] The court previously terminated the parental rights of Children's mother, L.C. (Mother).  Mother did not appeal the termination of her parental rights and has not participated in this appeal.

[2] Mother's and Father's parental rights to Children's siblings, C.J.W. and D.E.W., were involuntarily terminated previously.  Father is the natural father of C.J.W. and the adoptive father of D.E.W.  N.T., 1/2/18, at 46.  As discussed in more detail below, this Court affirmed the orders involuntarily terminating Father's parental rights to C.J.W. and D.E.W., but vacated the orders involuntarily terminating Father's parental rights to Children.

to place staying with various family members and one parent or the other as the parents split up and got back together.

On November 18, 2015, [BCCYS] made a referral for Family Guidance through Independent Family Services. The family has not been actively participating in the services.

The children have not had a stable home environment and several of the caregivers that the parents have left the children with are known drug users and/or individuals who have lost custody of their own children due to various reasons known to the agency.

The mother has entered drug treatment on multiple occasions, but has not completed any program successfully.

Law enforcement has been called to the residence several times for various issues and multiple reports from multiple sources have reported drug and alcohol concerns, domestic violence concerns, and lack of parenting skills of the parents.

In September 2015, assault charges were filed on the father for an incident involving the mother.

On January 8, 2016, [BCCYS] received a report that one of the minor children witnessed the mother giving herself a shot in the foot and elbow.

On February 24, 2016, the mother [] admitted to caseworker, Joy Bowser[,] that she had been snorting heroin. [BCCYS] requested that the mother enter a treatment program. Then, on February 26, 2016, the mother reported that she was attempting to set up an appointment with Twin Lakes.

On March 3, 2016, [BCCYS] made a home visit and spoke with the father []who reported that he was going to pick up the mother on March 4, 2016 from Pyramid in Altoona as she had entered treatment there approximately one week prior. Within a week

> of the mother[] returning from treatment, law enforcement was at the residence again as a result of an altercation between the parents. No charges were filed against either parent, but the father left the residence and went to State College with two (2) of the children.
>
> On March 15, 2016, the caseworker attempted a home visit and there was no answer. The mother texted the caseworker stating that she had an appointment set up with Twin Lakes.
>
> On March 16, 2016, it was reported that the mother was using heroin on March 15, 2016 and was vomiting when the CYS worker visited and no one answered the door. The mother dropped the children off with known drug users and went to the hospital for treatment for being sick the night before.

Order of Adjudication and Disposition – Child Dependent, 3/24/16, Findings of Fact.

Permanency review hearings were held on August 23, 2016, February 7, 2017, and July 20, 2017. Throughout these reviews, the trial court maintained the [c]hildren's commitment, and permanency goal. Father's progress toward remedying the circumstances causing the children to be placed was consistently noted as minimal. See Permanency Review Orders, 8/23/16; Permanency Review Orders, 2/7/17; Permanency Review Orders, 7/20/17. Notably, Father's visitation remained supervised and then was suspended due to continued substance abuse issues and domestic violence. Notes of Testimony ("N.T."), 11/15/17, at 6-8, 13-17, 33-35, 53, 57; see also Exhibit 12, 5/14/18.

BCCYS filed petitions for goal change and to terminate Mother's and Father's parental rights on July 11, 2017. The court held combined termination/goal change hearings on January 2, 2018 and May 14, 2018. In support of its petitions, BCCYS presented the testimony of: Terry O'Hara, Ph.D., licensed psychologist, who conducted individual evaluations with regard to Mother and Father and interactional evaluations of the children with Mother and Father and with their respective resource parents; Dennis Williamson, Family Counseling and Training Associates, who conducted anger management sessions with Father; Cheryl Ward,

licensed professional counselor, Cornerstone Community Services, who provided individual and group counseling services to Father through Bedford County Mental Health/Mental Retardation Agency; Deborah Kissel, program director and master's level clinician, Independent Family Services ("IFS"); Jessica Thomas, drug and alcohol counselor, Twin Lakes; and Natasha Crissey, caseworker, BCCYS. BCCYS additionally presented Exhibits 1 and 2 on January 2, 2018, and Exhibits 1 through 12 on May 14, 2018, which were admitted without objection. N.T., 5/14/18, at 78-81. Mother and Father were present and represented by counsel. Father testified on his own behalf. The [c]hildren were represented by a guardian ad litem, Carol Ann Rose, Esquire, who had been involved throughout the dependency proceedings. Further, pursuant to order dated October 10, 2017, the two older children, C.J.W. and D.E.W., were also appointed separate legal counsel, Gerald M. Nelson, Esquire, to represent their legal interests. Both Attorney Rose and Attorney Nelson participated in the relevant hearings with regard to termination and goal change.

In re J.C.W., No. 868 WDA 2018, unpublished memorandum at 5-9 (Pa. Super. filed Dec. 12, 2018) (footnotes omitted).

This Court summarized the pertinent testimony presented at the hearings as follows:[3]

. . . Natasha Crissey, BCCYS caseworker, testified that [Children were removed from Father's care by order of court; have been out of Father's care for more than twelve months; and] the circumstances that resulted in the removal of the children continued to exist. [N.T., 5/14/18,] at 68. Specifically, the record reveals that Father failed to complete anger management counseling. As testified by Dennis Williamson, who provided anger management sessions to Father, Father "dropped out" of his continued therapy that was scheduled to occur every two weeks after only three sessions. N.T., 1/2/18, at 57-58; see also Exhibit 2, 1/2/18. Additionally, Father was inconsistent in his attendance of individual mental health counseling, resulting in

_____

[3] Although the discussion related to Children's siblings, it is equally applicable to Children.

closure of his case. N.T., 5/14/18, at 10. Moreover, as indicated by Deborah Kissel, program director of IFS, Father's participation with the program was not consistent, but was "cyclical." Id. at 19-20. Thus, Ms. Kissel concluded that Father "failed to alleviate or address the concerns that initiated the services." Id. at 20. While recognizing some progress as to housing, she expressed issues as to parenting as observed in supervised visitation, anger management, and mental health treatment. Id. at 24-26.

. . . At the time of the conclusion of the relevant hearings, C.J.W. and D.E.W.[, as well as Children,] had been in care for over two years. Id. at 62. During this time, Father's visitation remained supervised until suspended in October 2017 and has remained suspended. Id. at 61, 73-74; see also Exhibit 12, 5/14/18; see also Order, 10/10/17. Further, and significantly, Dr. Terry O'Hara opined that Father was not in a position to adequately provide for the children's needs and welfare. Dr. O'Hara stated:

> Q. And then, Doctor, with regard to [Father], do you believe that based on your evaluations and information that was provided to you that [Father] is in a position at the present time to adequately care for the children's needs and welfare?
>
> A. No, I do not have sufficient evidence of that.
>
> Q. And can you summarize for the [c]ourt the reasons for that particular opinion?
>
> A. Yes. And I should say that this applies to [Mother], as well. I think [Mother] and [Father] both very much care for the children and care deeply about the children as well. I think that[']s true for both of them.
>
> But with regard to [Father], he takes no responsibility for his circumstances and that's problematic as given his concerns which I'll outline. I don't have evidence that he's willing to make substantive changes and really address a lot of the long[-]standing concerns which include mental health issues, substance abuse, significant alcohol abuse, and there are also anger management issues. So, there's evidence from the collateral source, which I referenced earlier, Bedford Somerset Developmental and Behavioral Health

- 6 -

Services[,] that [Father] has been diagnosed with major mental illness which includes major depressive disorder. Major depressive disorder refers to several periods where a person is really unable to function because of such a high level of depression. And so, diagnostically speaking the depression is so significant that it truncates one to (unintelligible) function and that would – that potentially could effect [sic] parenting, as well.

At the time of my evaluation of [Father] he lived in a two[-]bedroom residence. He acknowledged three incidents of domestic violence in his nine-year relationship with [Mother], although there's been significant allegations that the incidents were much more intensive and frequent. He also acknowledged that he lacked stability when the children were first placed. He acknowledged living with [Mother] in a "drug house" for a time. He also acknowledged simple assault as a juvenile. And then he has a variety of criminal activity as an adult including fleeing an officer in 2015, two contempt convictions in 2014, pleading no contest to simple assault in 2015, harassment in 2012, and retail theft in 2016. These are concerning issues that starting with as [a] juvenile[,] there's evidence of criminal activity for [Father], in conjunction with violating conditions of a PFA and the contempt convictions as well. So, under supervision there's evidence that he's done poorly as well.

He acknowledged continuous [sic] in returning to the relationship with [Mother], although from his report, he states that she's an addict and that she fabricates allegations against him. There's evidence of alcohol abuse with regard to [Father] from his disclosures to Bedford[,] for example. He's on probation at this point and his IQ score was actually in the borderline area as well, so there is evidence of some intellectual deficits for [Father].

And then in conjunction with these main concerns, I don't have any evidence that [Father] has sufficiently or appropriately addressed his anger management issues and his domestic violence, nor his mental

health issues and his alcoholic abuse history. So, there would be concerns from my perspective if the children would be at risk for exposure [to] domestic violence, expos[ure] to anger management issues, exposure to substance abuse and criminal activity, if they were to be returned to their father's care this time.

During the interactional evaluation involving the children and [Father], [Father] had a lot of difficulty controlling [C.J.W.]'s behavior. He lacks parental authority. He used (unintelligible) in an attempt to try to gain compliance from [C.J.W.] He lost his temper frequently, was very easily frustrated. There were a lot of parenting deficits noted with regard to [Father], as well. So, as a result of these factors I don't have evidence that [Father] is in a position to appropriately care for the children's needs and welfare.

N.T., 1/2/18, at 19-22. Consistent with Dr. O'Hara's testimony, Ms. Crissey indicated that termination would favor the [c]hildren's needs and welfare. N.T., 5/14/18, at 69.

\* \* \*

Notably, while Dr. O'Hara recognized that Father loved the [c]hildren and suggested that the [c]hildren would experience harm as a result of the termination of parental rights, Dr. O'Hara expressed that any harm to the [c]hildren would be outweighed by permanency. N.T., 1/2/18, at 22-24. Dr. O'Hara testified as follows:

Q. Dr. O'Hara, you previous[ly] stated that both parents do love their children. In your opinion, if the parents['] parental rights were [terminated], do you believe that there would be significant detriment to the children as a result of the termination of their parental rights?

A. I think that there would be some detriment for the children. I think the children did show positive, both with [Mother] and with [Father,] but the foundational issue from my perspective is the lack of stability that [Father] shows and [Mother] shows at this time. Also,

- 8 -

there's good reason suggesting that if a child is in a secure and stable household where a child's needs are being met and there's warmth and a supportive presence towards a child, this mediates [sic] against a potential detriment to the child. So, I think in the case of [S.J.W.] and [J.C.W., Jr.], there's good evidence from my perspective that the potential loss of the relationship would be mediated [sic] by the great level of care that they receive from [foster mother]. I would say the same about [C.J.W.] as well with regard to his paternal caregivers. And I think there is some evidence that [D.E.W.] has a connection with [foster mother]. I really hope that [foster mother] makes an improvement with regard to how she interacts with [D.E.W.] because I think [D.E.W.] has a lot of needs for affection and that sort of thing, which is a struggle for [foster mother] in my opinion. But overall[,] I think there's a benefit the children would receive in a situation of stability and care would outweigh any potential detriment in the termination of parental rights for [Father] and [Mother].

Id.

In re J.C.W., No. 868 WDA 2018, unpublished memorandum at 21-24, 28-29 (Pa. Super. filed Dec. 12, 2018) (footnotes omitted).

By orders dated May 14, 2018, the court involuntarily terminated Father's parental rights to Children, as well as D.E.W. and C.J.W., pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (5), (8), and (b). Father filed timely appeals of the May 14, 2018 orders. In a December 12, 2018 memorandum decision, this Court vacated the orders of May 14, 2018 with respect to Children, while affirming the orders with respect to D.E.W. and C.J.W.

With regard to Children, this Court raised sua sponte the issue of whether Attorney Rose, Children's guardian ad litem, adequately represented

their interests in the termination proceeding. Concluding that the record did not reveal any evidence that Attorney Rose had attempted to ascertain Children's preferred outcomes regarding the potential termination of Father's parental rights or advise the orphans' court of Children's preferences, we remanded for the orphans' court to appoint separate legal-interests counsel for Children and for counsel to interview Children, determine their preferred outcomes, and then communicate this information to the orphans' court. In re J.C.W., No. 868 WDA 2018, unpublished memorandum at 12-16 (Pa. Super. filed Dec. 12, 2018). We instructed, "[if Children's] preferred outcome is consistent with the result of the prior termination/goal change proceedings, the court shall re-enter its May 14, 2018 orders as to Father. If the preferred outcome is in conflict with the prior proceedings, the court shall conduct a new termination/goal change hearing as to Father only to provide J.C.W., Jr., and S.J.W.'s legal counsel an opportunity to advocate on behalf of their legal interests." Id. at 16.

Upon remand, the orphans' court entered an order dated March 27, 2019, appointing Attorney Gerald M. Nelson as legal counsel for both children. Subsequently, by order dated April 26, 2019, the court appointed Attorney Scott A. Walker as legal counsel for S.W.[4] The court conducted brief hearings

_____

[4] Father does not raise any claim on appeal with respect to the representation of Children by their legal counsel, and we conclude that the orphans' court appropriately appointed legal counsel pursuant to 23 Pa.C.S. § 2313(a). See

on March 27, 2019, and May 24, 2019, with respect to the appointment of counsel for Children. At the hearing on May 24, 2019, Attorney Walker represented that he interviewed S.W., who was "very adamant that he's very happy where he's at. And he doesn't want to return to either of his parents but he would like to have contact if possible with his biological parents." N.T., 5/24/19, at 3-4. The court scheduled a further hearing due to the court's and counsel's uncertainty about whether Children needed to testify regarding their preferred outcomes, and the best manner for Children's preferred outcomes to be placed on-the-record. Id. at 4-11. Accordingly, the orphans' court conducted a remand hearing on July 1, 2019.

At the start of the hearing, the court confirmed with both Attorney Nelson and Attorney Walker that they did not wish to call any additional witnesses. N.T., 7/1/19, at 5. Attorney Nelson, on behalf of J.W., Jr., reported that when he previously met with J.W., Jr., the child was easily distracted and unfocused. Id. J.W., Jr., stated that he was content where he was living, but did express a desire to be with Father. Id. Attorney Nelson also met with J.W., Jr., on the day of the hearing, and J.W., Jr., again expressed that he is comfortable where he currently lives, feels well taken care of and loved, and wants to remain there with his brother S.W. Id. at 6. J.W., Jr., expressed a

_____

In re: Adoption of K.M.G., 2019 PA Super 281 (en banc) (filed September 13, 2019) (holding that this Court has authority only to raise sua sponte the issue of whether the orphans' court appointed any counsel for the child, and not the authority to delve into the quality of the representation).

desire to continue to have contact with Father. Id. Attorney Nelson opined that, because J.W., Jr.'s, caregiver is Father's aunt, contact would likely continue. Id.

Attorney Walker stated that S.W. views his foster mother as his mother, and looks to her for his day-to-day needs. Id. at 7. S.W. loves his foster mother and looks to her for guidance and stability, and he wants to stay in her home. Id. However, S.W. expressed that he wants to remain in contact with Father as they talk frequently by telephone and he sees Father occasionally. Id. Attorney Walker observed that S.W. is bonded with Father, but wants to stay with his foster mother. Id. Attorney Walker believed, but could not guarantee, that the foster mother would permit continuing contact with Father. Id. at 7-8.

After Children's attorneys presented Children's preferred outcomes, which the attorneys represented were consistent with the prior termination orders, the court instructed Father's attorney to discuss the potential for a post-adoption visitation agreement; however, Father refused to enter such an agreement.[5] Id. at 6-7, 9. Instead, Father continued to oppose the

---

[5] Although not specifically identified, we presume that the discussion related to Act 101, which provides "an option for adoptive parents and birth relatives to enter into a voluntary agreement for ongoing communication or contact[.]" See 23 Pa.C.S. § 2731.

- 12 -

termination of his parental rights. Accordingly, Father's counsel called Father to testify regarding his continuing relationship with Children.

Father testified that he kept in contact with Children through phone calls, and saw them at family gatherings, as Children are cared for by his aunt. Id. at 11. Father asserted that he calls Children approximately once a week. Id. at 12. Although the foster mother allows Father to have contact with Children any time he wants, his contact was limited by his work schedule. Id. at 11-12. Father acknowledged that he did not maintain frequent physical contact with Children because he works in construction and travels throughout the region. Id. at 13-15.

Father testified that he continued to live in a trailer that was suitable and large enough for Children. Id. at 15-16. Father further testified that his life was stable and that he would quit his job if he could get Children back. Id. at 21-22. Father denied he currently received drug and alcohol or mental health treatment. Id. at 16. Father contended that he did not have a drug problem.[6] Id. However, he acknowledged that he had a pending DUI, which he asserted was "not applicable in this case." Id. at 17.

---

[6] Dr. O'Hara opined that Father had an alcohol use disorder, testifying that, in April 2016, Father self-reported that he drank 12 or more rum and Coke's two to three times per week, and there were periods where Father was intoxicated every day. N.T., 1/2/18, at 26-27. Further, Father reported to Dr. O'Hara that he drank ten beers once or twice a month. Id. at 27-28.

Father testified that Children's foster mother did a good job parenting Children, but asserted that Children still had a good relationship with him and still love him. Id. at 14-15. Father claimed that he wanted Children to return to his care, but also testified that he did not want to take their "mother figure," their foster mother, away. Id. at 17. Father summarized his position as follows:

> I'm happy with the whole mother figure and the way everything is going. I do not want to take that away from the kids, you know. And especially, [S.W.] fall into [sic] a big factor of that. I don't want to take them away from her. She's doing such a good job. And you know, between the help of the family and all, but I'm not signing my rights over either and still want to be able to get them.

Id. at 19.

Father acknowledged that he could not care for Children during the week, proposing that he would care for them on weekends and take vacations with them. Id. at 20. Father testified that he hoped Children would maintain "the same relationship with [the foster mother,]" but Father still wanted to be able to fulfill his parental responsibilities. Id. at 21.

At the conclusion of the hearing, the orphans' court placed its findings of fact and conclusions of law on-the-record. Initially, the court incorporated it previous findings. Id. at 26. The court concluded that BCCYS met its burden of proof pursuant to 23 Pa.C.S. § 2511(a)(8), observing that Children were removed from Father's care for a period exceeding 12 months, and that the reasons for the removal persisted. Id. The court credited testimony that, although Father had stable housing, he did not complete anger management

and was inconsistent in attending mental health counseling. Id. at 26-27. Further, the court observed that Father continued to have issues regarding supervised visits, anger management, and his mental health. Id. at 27.

With respect to 23 Pa.C.S. § 2511(b), the court noted that Children have a bond with Father, want to have contact with him, and that there would be some detriment to Children if Father's parental rights were terminated. Id. However, the court noted that this detriment would be mitigated by Children's attachment to their foster mother. Id. at 28. Further, the court observed that Children's bond with Father is but one factor to be considered, and concluded, "[t]here is a bond with the children, but I don't think it's sufficient in this case, given the deficiency in your situation[,] to overcome that." Id. Further, the court observed, the "mere fact of the existence of the bond wouldn't overcome the need for a stable and permanent home for these children." Id. at 29.

Accordingly, on July 3, 2019, the orphans' court entered orders involuntarily terminating Father's parental rights to Children pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (5), (8), and (b).[7] On July 9, 2019, Father timely filed notices of appeal and concise statements of errors complained of on appeal. On July 30, 2019, the orphans' court issued an order of court indicating that it intended to rely on its findings of fact and conclusions of law entered on-the-record, and the court did not issue a separate opinion.

_____

[7] The orders also changed Children's permanent placement goals to adoption. Father has not appealed with respect to the goal changes.

- 15 -

On appeal, Father raises the following issue for our review.

1. Whether the trial court erred/abused its discretion by determining that termination of [Father's] parental rights would best serve the developmental, physical, and emotional needs and welfare of the child[ren] under 23 Pa.C.S.A. § 2511(b), as the sum of the evidence showed the child[ren have] a strong, beneficial relationship with [Father] and wished to have contact with [their] father?

Father's brief at 5.

We review Father's claim in accordance with the following standard of review.

The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

In re T.S.M., 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

Section 2511 of the Adoption Act governs involuntary termination of parental rights. See 23 Pa.C.S. § 2511. It requires a bifurcated analysis.

. . . Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of

the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

In re L.M., 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

While the orphans' court here found that BCCYS met its burden of proof under 23 Pa.C.S. § 2511(a)(1), (2), (5), and (8), as well as (b), Father only challenges the orphans' court's conclusions with respect to Section 2511(b),[8] which provides as follows:

§ 2511. Grounds for involuntary termination

* * *

(b) Other considerations.--The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

* * *

_____

[8] Father waived any challenge to 23 Pa.C.S. § 2511(a) and the subsections thereof by failing to challenge that section in his Rule 1925(b) statement or in his brief. See Krebs v. United Refining Company of Pennsylvania, 893 A.2d 776, 797 (Pa. Super. 2006) (holding that an appellant waives issues that are not raised in both his or her concise statement of errors complained of on appeal and the statement of questions involved in his or her brief on appeal).

- 17 -

23 Pa.C.S. § 2511(b).

With respect to Section 2511(b), we consider whether termination of parental rights will best serve Children's developmental, physical, and emotional needs and welfare. See In re Z.P., 994 A.2d 1108, 1121 (Pa. Super. 2010). "In this context, the court must take into account whether a bond exists between child and parent, and whether termination would destroy an existing, necessary and beneficial relationship." Id. "[A] parent's basic constitutional right to the custody and rearing of . . . her child is converted, upon the failure to fulfill . . . her parental duties, to the child's right to have proper parenting and fulfillment of [the child's] potential in a permanent, healthy, safe environment." In re B.,N.M., 856 A.2d 847, 856 (Pa. Super. 2004) (internal citations omitted).

It is sufficient for the orphans' court to rely on the opinions of social workers and caseworkers when evaluating the impact that termination of parental rights will have on a child. In re Z.P., supra at 1121. The orphans' court may consider intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. See In re N.A.M., 33 A.3d 95, 103 (Pa. Super. 2011). Ultimately, the concern is the needs and welfare of a child. In re Z.P., supra at 1121.

In support of his contention that the court erred in its analysis of Section 2511(b), Father argues that Dr. O'Hara testified that it was evident that Father cared deeply for Children. Father's brief at 12. Further, Father contends that

he testified that he wants to have Children return home and to care for Children with the support of his family and friends. Id. Moreover, Father asserts that his other children still call him regularly and want to maintain a relationship with him. Id. Father contends that he now has housing, employment, and appropriate mental health treatment. Id. Additionally, Father observes that Children want continued contact with Father and that J.W., Jr., wants to live with Father. Id. at 13. Although Father acknowledges that continued contact with Children is likely, he notes that there is no guarantee of future contact and no recourse if contact is not permitted. Id. at 14. Father argues Children have a bond with him and that permanently severing the bond risks emotional harm to Children. Id. Accordingly, Father requests that the orders terminating his parental rights be reversed to "allow him to continue to work towards obtaining custody of his children." Id.

Our review of the record supports the orphans' court's conclusion that, despite the bond between Children and Father, termination of Father's parental rights is necessary to provide Children stability and permanency. At the time of the termination hearing in July 2019, Children had been in care for more than three years. As expressed by Dr. O'Hara, Children needed stability and appropriate care, and the benefits of providing stability and care would outweigh any potential detriment from terminating Father's parental rights. Moreover, even at the time of the July 1, 2019 termination hearing, Father had not addressed his instability, and proposed that he care for

Children on weekends.  In Father's place, Children have been cared for by their aunt, who provides Children with the stability and care that they need.

As we have stated, a child's life "simply cannot be put on hold in the hope that [a parent] will summon the ability to handle the responsibilities of parenting." Id. at 1125.  Rather, "a parent's basic constitutional right to the custody and rearing of his child is converted, upon the failure to fulfill his or her parental duties, to the child's right to have proper parenting and fulfillment of his or her potential in a permanent, healthy, safe environment." In re B., N.M., 856 A.2d 847, 856 (Pa. Super. 2004) (citation omitted).  Based upon our review of the record, we do not observe any error or law or abuse of discretion with regard to the orphans' court's decision to involuntarily terminate Father's parental rights to Children.  Accordingly, we affirm the orphans' court's orders.

Orders affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 11/22/2019

- 20 -